IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| **RIVER NORTH FURR'S, LLC,** § | |
| § | |
| **Plaintiff,** § | |
| § | Civil Action No. 5:19-cv-757 |
| v. § | |
| § | |
| **FMP SA MANAGEMENT GROUP, LLC,** § | |
| **LARRY HARRIS, JASON KEMP,** § | |
| **ALLEN JONES and BRIAN PADILLA,** § | |
| § | |
| **Defendants.** § | |

## ORIGINAL COMPLAINT

TO THE HONORABLE COURT:

River North Furr's, LLC ("**RNF**") files this Original Complaint against FMP SA Management Group, LLC ("**FMP**"), Larry Harris, Jason Kemp, Allen Jones and Brian Padilla (collectively, "**Defendants**"), and would respectfully show:

### I.  INTRODUCTION

1. In 2014, Defendants Harris, Kemp, Jones and Padilla (the "**Individual Defendants**") induced RNF to invest $1,750,000 in Alamo Furr's, LLC ("**Alamo**"), an entity otherwise owned entirely by the Individual Defendants. RNF's investment constituted about 90% of the total initial capital in Alamo and resulted in a 20% minority ownership interest in Alamo.

2. The Individual Defendants explicitly represented to RNF that its cash investment would be unconditionally repaid, plus interest, within five years. They also repeatedly promised that repayment would be guaranteed by cash-rich entities the Individual Defendants owned and controlled. One of those entities was Defendant FMP, which unconditionally guaranteed RNF's repayment.

3. The Individual Defendants made these promises to induce RNF's investment and then they memorialized that inducement, their promises and FMP's guaranty in writing.

4. In fact, the Individual Defendants never intended to repay RNF or live up to their promises and agreements. To the contrary, the Individual Defendants siphoned millions of dollars from Alamo, FMP and the other entities they controlled to support their lavish lifestyle with exotic cars, boats, homes and foreign travel, thereby causing the companies to default on their obligations to RNF.

5. Defendants conspired together to induce RNF to pay $1,750,000 in funds, then breached their duties and violated their obligations to RNF by brazenly refusing to repay this money on the agreed-upon terms. RNF brings this case to recover what it is owed, now in excess of $2 million, and to obtain a full and complete accounting of its investment.

## II.   THE PARTIES

6. Plaintiff RNF is an Illinois limited liability company with its principal place of business in Chicago, Illinois. RNF's members are: Mark Glazer, a citizen of Illinois; GPM, LLC, an Illinois limited liability company whose members are George Melshenker and Robert Feldgreber, both citizens of Illinois; Steven and Catherine Madlinger, both citizens of Illinois; and Furr's Capital Midwest, LLC, an Illinois limited liability company whose sole member is Sultan Issa, a citizen of Illinois. The members of RNF are referred to collectively as the "**RNF Investors**."

7. Defendant FMP is a Texas limited liability company with its principal place of business located at 120 Chula Vista, Hollywood Park, Texas. FMP's members are Larry Harris, Jason Kemp, Allen Jones and Brian Padilla, each of whom is a citizen of the State of Texas.

8. Larry Harris is an individual citizen of Texas and lives in Texas.

9. Jason Kemp is an individual citizen of Texas and lives in Texas.

10. Allen Jones is an individual citizen of Texas and lives in Texas.

11. Brian Padilla is an individual citizen of Texas and lives in Texas.

### III.   JURISDICTION & VENUE

12. This Court has diversity jurisdiction over the subject matter of RNF's claims pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000, and RNF is a citizen of a different state (Illinois) than each of the Defendants (Texas).

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1), (2) because all the Defendants reside in the Western District of Texas and a substantial part of the events or omissions giving rise to the claim occurred in the Western District of Texas.

### IV.   FACTUAL ALLEGATIONS

**A.   The Individual Defendants solicit money from the RNF Investors.**

14. The Individual Defendants are in the food service business. They hold themselves out as "partners" in various business ventures and entities, all operating under the umbrella name "Food Management Partners."

15. In dealings with the RNF Investors, Defendant Jason Kemp acted as the Individual Defendants' agent and spokesperson. Kemp represented that he had authority to act on behalf of the Individual Defendants, who made business decisions together, shared control of their entities, and shared the profits from their business endeavors. The Individual Defendants jointly owned and operated entities that provided management, administrative, and consulting services to restaurant clients, including restaurants that the Individual Defendants owned.

16. In the Spring of 2014, Kemp—on behalf of himself and the other Individual Defendants—called Steve Madlinger, one of the RNF Investors, to solicit a $1.75 million investment in the entity that would become Alamo. Alamo was being created to purchase various

Furr's Fresh Buffet restaurants in the San Antonio, Texas area from a company called Fresh Acquisitions, LLC.

17. Kemp, on behalf of the Individual Defendants, stated to Mr. Madlinger that the Individual Defendants had the technical skills to operate Alamo but needed a cash investment to fund the purchase. Kemp represented that the investment would be a great deal because of growth opportunities associated with Dynamic Foods, a division of Alamo. He further promised that any investment should be returned within eighteen months. Kemp represented that he and his partners—the other Individual Defendants—had expertise, and experience in this industry and had regularly completed deals like this one with family office investors. Kemp, again on behalf of all the Individual Defendants, also represented to Mr. Madlinger that no investor had ever lost money invested with them.

18. Kemp, on behalf of himself and the other Individual Defendants, further assured Mr. Madlinger and the other RNF Investors that not only would their $1.75 million cash investment be repaid within eighteen months and with 5% in interest per annum, the investment would not depend on the success of Alamo. Specifically, Kemp explained that he and his partners controlled a number of high-revenue entities that could act as guarantors for the loan.

19. One of those entities was BIII Wings, LLC ("**BIII**"), an entity owned by the Individual Defendants. As explained by Kemp, BIII made millions of dollars in annual revenue from "management fees" from individual Buffalo Wild Wings restaurants, which were also being operated by the Individual Defendants. In order to assure Mr. Madlinger and all of the RNF Investors that BIII was financially equipped to support the guaranty, Kemp and the other Individual Defendants promised not to change how BIII operated or to divert business or revenue from BIII.

4

20. Relying on and convinced by these express and material representations about the timing and terms for repayment, and about the financial performance of BIII, the RNF Investors formed RNF to make the Alamo investment of $1.75 million cash (the "**Initial Capital Contribution**"), securing a minority 20% stake in the company. By contrast, each of the Individual Defendants contributed just $50,000 cash to Alamo, securing a supermajority 80% stake in the company for themselves.

### B. The parties' written agreements.

21. On or around June 19, 2014, the Individual Defendants and RNF executed the Amended and Restated Limited Liability Company Agreement of Alamo Furr's, LLC ("**Alamo Company Agreement**"), a true and correct copy of which is attached hereto as **Exhibit 1** and incorporated by reference. Kemp's representations and inducements were expressly incorporated:

> "[I]n order **to induce** the Initial Capital Contribution to be made by RNF, the other Members hereof owning all of the equity of BIII (Larry Harris, Allen Jones, Jason Kemp and Brian Padilla) … by their signatures hereunder … agree to cause BIII to provide a guaranty (the "BIII Guaranty") to RNF with respect to the return of RNF's Unreturned Capital Contribution plus any accrued but unpaid Preferred Return thereon **not later than the fifth anniversary of the closing**…."

*See* Ex. 1 § 3.4 (emphasis added).

22. The Alamo Company Agreement appointed the Individual Defendants as Managers of Alamo with the power and authority to manage Alamo's business and affairs. *See id.* at Art. I; § 5.3. It also reflects the disproportionate capital contributions made by RNF and the Individual Defendants. For RNF's Initial Capital Contribution, it received 1,750,000 "Series A" units of ownership in Alamo. For each of the Individual Defendants' Initial Capital Contribution of

5

$50,000 in cash and stated $1,700,000 in "service," each Individual Defendant received 50,000 "Series A" units of ownership and 1,700,000 "Series B" units of ownership. *See id.* at Schedule A.

23. Concerning repayment of RNF's Initial Capital Contribution, the Alamo Company Agreement provided that:

   a. "Series A" units, or units making cash contributions, were entitled to a Preferred Return of 5% per annum on Initial Capital Contributions, compounding quarterly and beginning to accrue on the first anniversary of the closing (the "Preferred Return"); and

   b. Until RNF's capital contribution had been repaid, Alamo could not enter into or amend in any material respect any transaction between Alamo and any member, manager or affiliate of any member or manager without the approval of a Super Majority Interest including the approval of RNF.

*See id.* §§ 3.4, 5.16(c).

24. Simultaneous with the Alamo Company Agreement, and incorporated as an exhibit to that document, was the Unconditional Guaranty of Payment and Performance executed by Kemp on behalf of BIII as Guarantor (the "**Guaranty**"). *See id.* at Ex. B. In relevant parts, the Guaranty:

   a. Unconditionally guaranties to RNF the repayment of its Initial Capital Contribution and Preferred Return no later than the fifth anniversary of the closing, *i.e.*, June 19, 2019;

   b. Repeats that the Guaranty "is in consideration of, and in order to induce" RNF to make the Initial Capital Contribution to Alamo;

    c.      Acknowledges that the Guarantor's ability to satisfy its obligations under the Guaranty and the willingness of RNF to accept the protections of the Guaranty are dependent on the Guarantor continuing to operate its business in the same manner as previously, without diversion of management fees or revenue streams;

    d.      Includes a covenant that "during the period that any portion of [RNF's] Unreturned Capital Contribution or Preferred Return shall remain unpaid, Guarantor shall continue to operate its business in the same manner in which such business has been operated prior to the date hereof and shall not divert future business opportunities, management fees or other revenue streams to any other person or entity;"

    e.      Provides that if the Guarantor breaches or violates this covenant, any such diversion would be deemed null and void, and any diverted revenue or business would be deemed "held in trust for the benefit of RNF… and fully recoverable by RNF pursuant to this Guaranty;" and

    f.      States the Guarantor "shall reimburse and pay to RNF all reasonable fees, costs and expenses, including reasonable legal fees, paid or incurred by RNF in connection with all efforts by RNF to enforce its rights against Guarantor…."

*See id*.

25.    These express written representations and obligations induced RNF to fund the transaction.

### C. The Individual Defendants sell off BIII's revenue sources without notice and in violation of the Guaranty.

26. When the Individual Defendants offered BIII as the guarantor of RNF's repayment, BIII was managing Buffalo Wild Wings franchises owned indirectly by the Individual Defendants through a web of entities that they controlled. According to Kemp, BIII received substantial management fees for its operation of the franchises, which resulted in millions in annual revenue. RNF accepted BIII as a guarantor because of Kemp's representations about the revenue stream, which Kemp, on behalf of himself and the other Individual Defendants, promised would continue.

27. However, following the closing in June 2014, and despite their verbal promises and written obligations to the contrary, the Individual Defendants, acting collectively through their partnership, sold the Buffalo Wild Wings restaurants they owned or controlled. This materially reduced BIII's operations and cash flow, materially changed its financial condition, and rendered BIII unable to back the Guaranty. Neither BIII, any of the Individual Defendants, nor Alamo notified RNF of these changes in BIII's business operations. The Individual Defendants knowingly engaged in these transactions in violation of the express covenant prohibiting any actions resulting in a change to BIII's business operations. As a direct result, BIII's Guaranty was rendered meaningless.

28. Under the terms of the Guaranty, BIII was obligated to provide monthly financial statements. When that did not occur in June 2015, RNF made inquiries. In response, the financial statements were not provided. Only much later did the Individual Defendants disclose the news of the restaurant sales.

29. As a result, on August 3, 2015, Mr. Madlinger advised Defendants in writing that "BIII Wing, LLC is collateral for River North Furr's investment in Alamo Furr's. If that entity is going away with the sale of the BWW franchises (either assets or Member Interests), then we will

need to find a collateral replacement." The Individual Defendants responded, through their agent Peter Donbavand, that "BIII Wing still has enough cash/receivables to more than cover the amount being guarantied so a replacement guarantor is not needed." This representation was false.

30. Pressed by RNF, the Individual Defendants agreed to provide FMP as a replacement guarantor. To evaluate this option, Mr. Madlinger requested FMP's financial statements and ownership information. The Individual Defendants, through their agents, provided information showing revenue of between $6.3 million and $8.6 million annually and increasing. They also provided information confirming that FMP was owned by the Individual Defendants, that future revenues were expected to be consistent with prior revenues, and that FMP's only other guarantor obligations were on an office lease and some food vendor contracts. Concerning revenue, they stated in a November 12, 2015 e-mail that "FMP SA is a highly profitable LLC for years to come." The Individual Defendants provided this information with the intent that RNF would rely on it and accept FMP as the substitute guarantor.

31. Relying on these representations, on or around November 30, 2015, RNF, BIII, and FMP entered into an Assignment and Assumption Agreement with Novation ("**Assumption Agreement**"), a true and correct copy of which is attached hereto as **Exhibit 2**. In the Assumption Agreement, FMP assumed the role of guarantor pursuant to the Guaranty and took on all of the obligations and covenants of BIII.

### D. The Individual Defendants drain FMP's cash and encumber its assets in violation of the Guaranty.

32. After executing the Assumption Agreement in November 2015, FMP continued to generate millions of dollars in revenue and profits. In 2016, it generated $14.7 million of revenue and $8.6 million in profits; and, in 2017, it generated $9.6 million of revenue and $4.3 million in profits. Notwithstanding the terms of the Guaranty, however, the Individual Defendants took this

money for themselves, leaving less than $700,000 in the company by the end of 2017. In summary, the Individual Defendants distributed $12 million to themselves from FMP over these two years without any thought or regard given to establishing a reserve fund or otherwise accounting for FMP's Guaranty obligation to RNF.

33. In addition to draining the cash in FMP for themselves, the Individual Defendants further undermined FMP, and expressly violated the terms of the Guaranty, by taking on additional guaranty obligations for debt owed by Alamo. This included making FMP first the guarantor, and later a co-borrower, on Alamo's $23 million loan from Arizona Bank & Trust.

34. Prior to executing the Assumption Agreement, RNF had specifically inquired whether FMP had any debt obligations to Arizona Bank & Trust. The Individual Defendants, through Donbavand and Kemp, falsely represented that there were none. RNF was not informed until June 4, 2019 that the Individual Defendants had made FMP a co-borrower encumbered by Alamo's $23 million debt in express violation of the FMP's covenant in the Guaranty to "operate its business in the same manner in which such business has been operated prior to the date" of the Guaranty. Like BIII (the first guarantor), FMP as a guarantor was rendered meaningless by the Individual Defendants' conduct.

### E. The Individual Defendants default on repayment and continue to make empty promises.

35. Payment of interest on RNF's $1.75 million investment, at a 5% "Preferred Return" rate, was to begin after one year, but that never occurred.

36. At an April 7, 2016 meeting with Mr. Madlinger, Kemp promised that the Individual Defendants would begin making $100,000 distributions monthly to RNF throughout 2016. Kemp's statement was false. No payments were made, either directly from Alamo or from FMP, as guarantor, despite FMP's $8.6 million in profits that year.

37. Repeated promises of repayment were made, but never kept. For example, in November 2016, Kemp wrote to George Melshenker, one of the RNF Investors, saying he would "get with my partners [the Individual Defendants] and see how we can help you exit the investment." Despite repeated attempts by Melshenker, however, Kemp and the other Individual Defendants ignored his demands and continued to default on the payment obligations.

38. On May 19, 2017, Kemp wrote: "George, I am looking into this …. We are looking into exit strategies for you and Steve [Madlinger]." Kemp continued during 2017 to make false statements about the efforts of the Individual Defendants to return the RNF investment, when in fact he was doing nothing.

39. In November 2017, Madlinger wrote to Kemp saying, "We are coming upon 4 years in this investment and accordingly would like you to consider some repayment plan." Kemp's response, on behalf of himself and the other Individual Defendants, was: "We will see what kind of plan we can put together."

40. On February 3, 2018, Mr. Madlinger wrote to Kemp frustrated about his attempts to get information and/or a repayment commitment from the Individual Defendants.

41. In April 2018, Mr. Madlinger and Kemp had a phone call during which Kemp stated that he and his partners—the other Individual Defendants—were prepared to write RNF a check at that time. That never happened.

42. Throughout the remainder of 2018 and into 2019, Kemp continued to placate RNF with statements about the improving business condition of Alamo, including discussions about new opportunities for increased sales at Furrs and at Dynamic as well as potential merger or sale opportunities. Nonetheless, no payments were made to RNF to return its investment or pay any interest on it.

43. On February 28, 2019, Mr. Madlinger wrote to Kemp again asking for a meeting to discuss return of RNF's investment. No such meeting ever occurred.

**F.    The Individual Defendants' outrageous "Capital Call."**

44. On or about May 9, 2019, RNF received from Alamo a notice of a purported $4.4 million "Capital Call." The Capital Call was signed by Donbavand on behalf of Alamo. However, on information and belief, the Capital Call was designed and instigated by the Individual Defendants acting collectively as the managers of Alamo.

45. The Capital Call purported to demand $4.4 million in cash from each of the Individual Defendants and RNF. Included in the uses of the additional capital being requested was $2,134,730 to be used to pay RNF its initial cash contribution plus interest. The Capital Call indicated that new shares would be issued based upon it.

46. RNF declined the invitation to pay itself the money Alamo owed it and that had been guaranteed by the Individual Defendants, first through BIII and then through FMP. RNF further insisted that it be provided detailed financial information to support why this massive capital call was justified. This included RNF's request for an explanation why the Individual Defendants intended for Alamo to utilize its capital to pay FMP, which they own and control, $11.75 million in management fees. Defendants never provided that explanation consistent with their pattern of failing to timely provide RNF with Alamo's monthly financial reports.

47. On information and belief, none of the Individual Defendants who voted for this Capital Call invested any further cash in response to it and it was never their intent to do so in the first place.

**G.     The Individual Defendants fail to repay RNF's investment when due.**

48.     On May 17, 2019, RNF wrote to FMP and the Individual Defendants demanding payment in the full amount owed ($2,134,730.00) on the June 19, 2019 due date.  On June 4, 2019, FMP and the Individual Defendants responded, essentially stating that no payment would be forthcoming.

49.     The June 19, 2019 deadline passed without payment from any of the Defendants to RNF of either its initial cash contribution or any interest on that investment.

## V.     CAUSES OF ACTION
### Count I: Breach of Guaranty – Against FMP

50.     Pursuant to Fed. R. Civ. P. 10(c), RNF incorporates by reference all of the forgoing allegations as if fully set forth herein.

51.     The Guaranty was issued in consideration of and in order to induce RNF to make the Initial Capital Contribution to Alamo.

52.     RNF made the Initial Capital Contribution to Alamo.

53.     FMP was unconditionally obligated under the Guaranty and Assumption Agreement to pay RNF the Preferred Return and repay RNF's Initial Capital Contribution no later than the fifth anniversary of the closing, or by June 19, 2019.

54.     FMP has not done so and has refused to do so, in breach of the Guaranty.

55.     Additionally, FMP was obligated under the Guaranty and Assumption Agreement to continue to operate its business in the same manner as prior to the date of the Guaranty and not to divert management fees or other revenue streams to any other person or entity.  FMP breached its covenants in this regard by, as further alleged above: (i) diverting revenues from management fees to the Individual Defendants; and (ii) agreeing to become a co-borrower with Alamo on a $23 million loan.

56. As a direct and proximate cause of FMP's breaches of the Guaranty, RNF has been damaged in an amount in excess of $2,134,730, for direct and consequential damages. Additionally, pursuant to the Guaranty, RNF is entitled to recover its reasonable and necessary attorney's fees and costs from FMP.

### Count II: Statutory Fraud Pursuant to Texas Business and Commerce Code § 27.01 – Against Individual Defendants

57. Pursuant to Fed. R. Civ. P. 10(c), RNF incorporates by reference all of the forgoing allegations as if fully set forth herein.

58. Texas Business and Commerce Code § 27.01(a) provides that "[f]raud in a transaction involving … stock in a corporation or join stock company consists of a … (2) false promise to do an act, when the false promise is (A) material; (B) made with the intention of not fulfilling it; (C) made to a person for the purpose of inducing that person to enter into a contract; and (D) relied on by that person in entering into that contract."

59. Pursuant to Texas Business and Commerce Code § 27.01(b)-(c), the persons making a false representation or false promise are liable for actual damages and may be liable for exemplary damages.

60. Additionally, pursuant to Texas Business and Commerce Code § 27.01(d), a person who has actual awareness of a false representation or promise made by another person, fails to disclose the falsity of the representation to the person defrauded, and benefits from the false representation or promise is liable for exemplary damages.

61. In order to induce RNF to enter into the Alamo Company Agreement and provide $1.75 million in exchange for units of ownership in Alamo, the Individual Defendants represented to RNF that RNF would be unconditionally paid a Preferred Return and repaid its Initial Capital

Contribution within five years, including as necessary by a Guarantor owned in partnership by the Individual Defendants.

62. Absent this representation, RNF would not have invested $1.75 million in Alamo, as reflected on the face of the Alamo Company Agreement.

63. This representation was made with no intention of fulfilling it and with actual awareness of the falsity of the representation, as demonstrated by the following actions of the Individual Defendants, further set forth above:

   a. Selling off revenue sources of BIII, the entity providing the original guaranty;

   b. Lying to RNF about BIII and the Guaranty;

   c. Bleeding FMP of its cash and encumbering it to such an extent that it could not fulfill its Guaranty obligations, including by taking the revenue of FMP for themselves rather than allowing that revenue to secure RNF's investment, as they promised;

   d. Making repeated false statements to RNF concerning whether and when repayment would be made; and

   e. Making the false "Capital Call" to attempt to have RNF fund its own repayment.

64. For the past five years, none of the Individual Defendants disclosed the falsity of their representations to RNF. To the contrary, Kemp—their spokesperson—regularly and frequently reassured RNF that its investment would be repaid, with interest.

65. Each of the Individual Defendants benefitted from the false representations to RNF, which were made by their partners and agents.

66. RNF has experienced actual damages as a result of the false representations herein alleged, including no less than $2,134,730, which is the amount the Individual Defendants falsely promised would be returned to RNF, including interest through June 19, 2019. Further, pursuant to Texas Business and Commerce Code § 27.01(e), RNF is entitled to recover from the Individual Defendants its "reasonable and necessary attorney's fees, expert witness fees, costs for copies of depositions, and costs of court."

### Count III: Constructive Trust – Against Individual Defendants

67. Pursuant to Fed. R. Civ. P. 10(c), RNF incorporates by reference all of the forgoing allegations as if fully set forth herein.

68. The Guaranty provides that as long as RNF's Preferred Return and Initial Capital Contribution had not been paid, FMP is obligated under the Guaranty and Assumption Agreement to continue to operate its business in the same manner as prior to the date of the Guaranty and to not divert management fees or other revenue streams to any other person or entity.

69. The Guaranty provides that if the Guarantor breaches or violates this covenant, any diversion would be deemed null and void, and any diverted revenue or business would be deemed "held in trust for the benefit of RNF… and fully recoverable by RNF pursuant to this Guaranty."

70. As alleged above, during the period when RNF's investment and interest remained unpaid, FMP improperly diverted management fees and revenue streams to the Individual Defendants by way of distributions from which they were personally enriched and benefitted.

71. Further, during the period when RNF's investment and interest remained unpaid, the Individual Defendants caused FMP to become a co-borrower on a $23 million loan to Alamo, changing the manner of operation of its business.

72. Consistent with the terms of the Guaranty, because FMP thus breached the covenants of the Guaranty, money distributed to the Individual Defendants, including up to $12

million in distributions of 2016 and 2017 FMP profits to them, were to be held in trust for the benefit of RNF. Accordingly, RNF requests that the Court impose a constructive trust over these funds.

### Count IV: Civil Conspiracy – Against Individual Defendants

73. Pursuant to Fed. R. Civ. P. 10(c), RNF incorporates by reference all of the forgoing allegations as if fully set forth herein.

74. The Individual Defendants conspired together with the purpose of inducing RNF to enter into the Alamo Company Agreement and provide $1.75 million of cash capital to Alamo.

75. Each of the Individual Defendants, acting as a partnership and holding themselves out as such, agreed with the other to make false representations to RNF resulting in statutory fraud pursuant to Texas Business and Commerce Code § 27.01.

76. Specifically, the Individual Defendants agreed to state to RNF that RNF would be unconditionally repaid its investment plus interest within no more than five years of the closing, including by a Guarantor owned and controlled by the Individual Defendants. These representations were false and the Individual Defendants had no intention of fulfilling their promises, as demonstrated by the facts pleaded above and incorporated herein.

77. The Individual Defendants made the false representations to RNF verbally, in the written Alamo Company Agreement and Guaranty, and in multiple oral and written communications following the closing into 2019.

78. The Individual Defendants' conspiracy to commit statutory fraud, and the acts taken in furtherance of that conspiracy, as alleged herein, directly and proximately caused damages to RNF in an amount not less than $2,134,730.

### Count V:  Fraudulent Inducement – Against All Defendants

79. Pursuant to Fed. R. Civ. P. 10(c), RNF incorporates by reference all of the forgoing allegations as if fully set forth herein.

80. Defendants made representations about FMP, BIII, and their business operations, financial conditions, and future abilities and willingness to guaranty the RNF investment. Defendants' representations were false.

81. Defendants knew their representations were false when they were made, or they made the representations recklessly, as a positive assertion without knowledge of their truth.

82. Defendants made their representations with the intent that RNF rely on them.  RNF acted justifiably and reliably on Defendants' representations.  As a result of the misrepresentations, RNF has suffered injury, including the failure to be repaid its investment on the terms promised, in an amount in excess of $2,134,730.

### VI.    CONDITIONS PRECEDENT

83. Pursuant to Fed. R. Civ. P. 10(c), RNF incorporates by reference all of the forgoing allegations as if fully set forth herein.

84. All conditions precedent for bringing this suit have been performed or have occurred.

### VII.   JURY DEMAND

85. Pursuant to Fed. R. Civ. P. 38, Plaintiff RNF hereby requests a jury trial on all issues so triable and has tendered the appropriate fee.

### VIII.  PRAYER

WHEREFORE, RNF prays that this Court enter Judgment in its favor and against the Individual Defendants in an amount to be determined by the Court, but not less than $2,134,730,

plus such other relief as the Court deems just and proper, including exemplary damages, reasonable and necessary attorney's fees, expenses, and court costs as permitted by law.

DATED:  June 27, 2019

               Respectfully submitted,

               **DAVIS & SANTOS, P.C.**

By:   */s/ Jason M. Davis*
       Jason M. Davis
       State Bar No. 00793592
       E-mail:  *jdavis@dslawpc.com*
       Caroline Newman Small
       State Bar No. 24056037
       Email:  *csmall@dslawpc.com*
       719 S. Flores Street
       San Antonio, Texas 78204
       Tel:  (210) 853-5882
       Fax: (210) 200-8395
       ***Attorneys for Plaintiff River North Furr's LLC***

Robert Andalman, *pro hac vice motion to be filed*
Rachael Blackburn, *pro hac vice motion to be filed*
Kristin Opal, *pro hac vice motion to be filed*
A&G Law, LLC
542 South Dearborn St., 10th Floor
Chicago, Illinois 60605
Phone: 312.348.7629
randalman@aandglaw.com
rblackburn@aandglaw.com
kopal@aandglaw.com