## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **RIVER NORTH FURR'S, LLC,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **Civil Action No. 5:19-cv-757** |
| **v.** | § | |
| | § | |
| **FMP SA MANAGEMENT GROUP, LLC,** | § | |
| **LARRY HARRIS, JASON KEMP,** | § | |
| **ALLEN JONES and BRIAN PADILLA,** | § | |
| | § | |
| **Defendants.** | § | |

### PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS

TO THE HONORABLE COURT:

Plaintiff River North Furr's, LLC ("**RNF**") files this response to Defendants' Motion to Dismiss (ECF No. 11), and in support would respectfully show:

### I.      INTRODUCTION

1.      Plaintiff RNF filed this lawsuit on June 27, 2019 to recover more than $2 million lost after Defendants Larry Harris, Jason Kemp, Allen Jones and Brian Padilla (collectively "**Individual Defendants**") induced RNF: first, to invest in an entity called Alamo Furr's, LLC ("**Alamo**"); and second, to accept Defendant FMP Management Group, LLC ("**FMP**") as a substitute guarantor of that investment.

2.      RNF's complaint alleges five causes of action: (i) Count I: breach of the FMP guaranty that the Individual Defendants induced RNF to accept (against FMP); (ii) Count II: statutory fraud pursuant to Texas Business and Commerce Code § 27.01 (against the Individual Defendants); (iii) Count III: imposition of a constructive trust on the revenue they diverted from FMP (against the Individual Defendants); (iv) Count IV: conspiracy to defraud (against the

Individual Defendants); and (v) <u>Count V</u>: common law fraudulent inducement (against the Individual Defendants).[1]

3.       Defendants neither answered nor moved to dismiss Counts I and III. Instead, they filed a cursory and baseless motion to dismiss Counts II, IV and V, arguing that RNF did not sufficiently specify the fraudulent statements upon which RNF relied, who made those statements, and certain details of Defendants' conspiratorial agreement. ECF No. 11. These arguments are belied by the detailed allegations apparent from the face of the complaint. Moreover, Defendants' fraudulent representations and their agreement that RNF was induced by those specified representations to make its investment are reduced to writing in the underlying agreement attached to and incorporated into the complaint. *See* ECF No. 1, Ex. 1. Accordingly, Defendants' claim that they lack notice of the alleged misrepresentations rings especially hollow.

4.       As discussed in more detail below, motions to dismiss are disfavored and require that all the allegations of the complaint be accepted as true and all inferences from those allegations be drawn in favor of the plaintiff. Applying this standard, Defendants' motion is properly denied.

## II.       FACTUAL BACKGROUND[2]

5.       The four Individual Defendants are in the food service business. Compl. ¶ 14. They hold themselves out as "partners" in various business ventures and entities that operate under the umbrella name "Food Management Partners." *Id*.

---

[1]       Count V is captioned as being against "All Defendants," but in substance and fact it only makes claims against the Individual Defendants.

[2]       "When considering a motion to dismiss, the court accepts as true the well-pled factual allegations in the complaint, and construes them in the light most favorable to the plaintiff." *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002). Accordingly, each fact recited herein is accompanied by a reference to the corresponding allegation from Plaintiff's Original Complaint. ECF No. 1.

6.      During the Spring of 2014, Defendant Kemp approached Steve Madlinger, one of RNF's investors. *Id.* ¶ 16. Kemp told Madlinger that he had authority to speak for the other Individual Defendants, explaining that they made business decisions together, shared control of their companies and shared profits. *Id.* ¶ 15. Kemp then solicited a $1.75 million investment in Alamo from Madlinger and the other RNF investors. *Id.* ¶¶ 1, 6, 16. According to Kemp, Alamo was being created to purchase various restaurants in the San Antonio, Texas area. *Id.* ¶ 16. Kemp told Madlinger about the Individual Defendants' industry experience, ability to operate Alamo, the growth opportunities for the investment, and the Individual Defendants' successful completion of similar deals in the past. *Id.* ¶ 17. Kemp enticed the RNF investors by promising RNF would be repaid promptly, as soon as within eighteen months, plus 5% interest. *Id.* ¶¶ 17-18.

7.      In his statements made to induce the RNF investment, Kemp, on behalf of all the Individual Defendants, emphasized that RNF's return, including interest, did not depend on Alamo's success because one of the Individual Defendants' high-revenue entities, which at first was a company called BIII Wings, LLC ("**BIII**"), would guaranty payment. *Id*. ¶¶ 18-19. Kemp said that BIII made millions in annual revenue from "management fees" from individual Buffalo Wild Wings restaurants, which were also owned and operated by the Individual Defendants. *Id*. ¶¶ 19, 26. As alleged, "[i]n order to assure Mr. Madlinger and all of the RNF Investors that BIII was financially equipped to support the guaranty, Kemp and the other Individual Defendants promised not to change how BIII operated or to divert business or revenue from BIII." *Id*. ¶ 19.

8.      The complaint is clear: RNF made its investment "[r]elying on and convinced by these express and material representations about the timing and terms for repayment, and about the financial performance of BIII …." *Id*. ¶ 20.

9.     Effective June 19, 2014, the Individual Defendants and RNF entered into the Alamo Company Agreement, which each Individual Defendant signed. *Id*. ¶ 21. Confirming that Kemp had spoken on each of their behalves during the Spring 2014 discussions, the Alamo Company Agreement restated and reiterated that RNF had been induced to make its investments by Kemp's specific representations. *Id*. ¶¶ 21-23. Thus, each of the Individual Defendants agreed:

> "*[I]n order to induce the Initial Capital Contribution* [of $1.75 million] to be made by RNF, the other Members hereof owning all of the equity of BIII (Larry Harris, Allen Jones, Jason Kemp and Brian Padilla) … by their signatures hereunder … agree to cause BIII to provide a guaranty (the "BIII Guaranty") to RNF with respect to the return of RNF's Unreturned Capital Contribution plus any accrued but unpaid Preferred Return thereon not later than the fifth anniversary of the closing.

*Id*. ¶ 21 (emphasis added) (quoting the Alamo Company Agreement, § 3.4, Compl. Ex. 1).

10.     The BIII Guaranty was included in the Alamo Company Agreement as an exhibit. *Id*. ¶ 24 & Compl. Ex. 1. It stated that the Individual Defendants would continue to operate BIII in the same manner as before and would not divert business opportunities or revenue from BIII. *Id*. The complaint enumerates the representations of the BIII Guaranty and the promises contained therein. *Id.*, ¶ 24. These are the among the representations that each Individual Defendant agreed in the Alamo Company Agreement "induced RNF to fund the transaction." *Id*. ¶ 25.

11.     The Individual Defendants never intended to keep their promises made both before and in the Alamo Company Agreement. This is evidenced by the fact that almost immediately after closing on RNF's investment, they began taking steps to "materially reduce[] BIII's operations and cash flow, materially change[] its financial condition, and render[] BIII unable to back the Guaranty." *Id*. ¶ 27. The Individual Defendants concealed these violations of the BIII Guaranty from RNF, refusing to provide financial reports as required, even when RNF demanded those reports. *Id*. ¶¶ 27-28. Thus, it was not until August 2015, a year later, that RNF learned the facts and confronted the Individual Defendants, asking for a replacement guarantor. *Id*. ¶ 29.

4

12.     Ultimately, the Individual Defendants agreed to replace the depleted BIII with FMP as guarantor of RNF's investment. *Id*. ¶ 30. To induce RNF to accept this replacement, the Individual Defendants, through their agents, provided financial statements to RNF about FMP. *Id*. They promised that "FMP SA is a highly profitable LLC for years to come." *Id*. They confirmed that they were the owners of FMP and promised that FMP's other guarantor obligations were minor for some food vendor contracts. *Id*. During these discussions, RNF specifically asked whether FMP had any debt obligations to Arizona Bank & Trust, Alamo's lender. *Id*. ¶ 34. Through Kemp and Peter Donbavand, Alamo's Registered Agent, the Individual Defendants assured RNF that it did not. *Id*.; *see also* Alamo Company Agreement, § 2.3, Compl. Ex. 1. The Individual Defendants intended RNF to rely on these statements and RNF did so. *Id*. ¶¶ 30-31.

13.     On November 30, 2015, RNF, BIII and FMP entered into an Assignment and Assumption Agreement (the "**Assumption Agreement**") formalizing FMP as the new guarantor. *Id*. ¶ 31 & Compl. Ex. 2. The Assumption Agreement was signed by Kemp as the designee of the Individual Defendants for BIII and FMP. *Id*. In it, all the representations that had been made about BIII, which induced RNF to accept it as a guarantor, were repeated for FMP. *Id*. This included the promise not to divert revenue from the entity that could be used to fund the guaranty, as necessary. *Id*. (alleging FMP "took on all of the obligations and covenants of BIII").

14.     In 2016-2017, FMP generated millions of dollars in revenue and profits, but despite the Guaranty's terms, the Individual Defendants diverted this revenue to themselves. *Id*. ¶ 32. In total, in the two calendar years after the Assumption Agreement was signed, the Individual Defendants diverted $12 million to themselves from FMP. *Id*. At the same time, without the knowledge of RNF, the Individual Defendants made FMP a co-borrower on Alamo's $23 million in debt, further enfeebling FMP. *Id*. ¶ 34.

5

15.     The Individual Defendants demonstrated by their conduct that they never intended to live up to their promises to RNF. *Id.* ¶ 63. Not only did they immediately take steps to first render BIII and then FMP incapable of funding their guaranty obligations, they also never made a single payment to RNF. *Id.* ¶¶ 35, 63. Further, beginning in 2016 and into 2019, Kemp, on behalf of the Individual Defendants, made repeated false promises of payments that never occurred. *Id.* ¶¶ 36-42.

16.     In June of 2019, the five-year deadline by which RNF was to be paid passed without any payment. *Id.* ¶¶ 48-49. At that point, RNF had no choice but to pursue this lawsuit, which RNF then filed.

### III.      ARGUMENT & AUTHORITIES

17.     RNF's complaint is detailed, specific, and satisfies the Rule 9(b) standard for pleading. There is no merit to Defendants' arguments that they cannot tell from these allegations what fraudulent representations were made by whom or that the complaint lacks factual allegations that plausibly suggest a conspiracy among them. As discussed below, Defendants' motion to dismiss should be denied.

#### A.  Legal standard.

18.     As this Court has pointed out, "[m]otions to dismiss are disfavored and rarely granted." *Friedrich Air Conditioning Co. v. Estes Express Lines*, No. SA-07-CA-794-OG, 2007 U.S. Dist. LEXIS 105477, at *1-2 (W.D. Tex. Oct. 24, 2007) (Garcia, J.) (citing *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982)); *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (reversing dismissal and observing that "a motion to dismiss under 12(b)(6) is viewed with disfavor and is rarely granted") (citation omitted). When the Fifth Circuit reversed the order of dismissal in *Turner* it stated that to survive,

a complaint need only "plead 'enough facts to state a claim to relief that is plausible on its face.'"
*Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Fifth Circuit further
observed that while a complaint must include more than conclusions, it "'need not contain detailed
factual allegations'" but only "enough facts to move the claim 'across the line from conceivable
to plausible.'" *Id.* (citations omitted).

19.     As previously noted, on a motion to dismiss, "a court must accept as true all of the
factual allegations contained in the complaint." *Cardona v. Briones*, No. SA-11-CA-781-OG, 2012
U.S. Dist. LEXIS 195546, at *16 (W.D. Tex. Mar. 9, 2012). The pleaded facts are further to be
"viewed in the light most favorable to the plaintiff." *Royalty Clearinghouse, Ltd. v. CTS Props.*,
No. A-16-CV-1342-LY-ML, 2017 U.S. Dist. LEXIS 213639, at *21 (W.D. Tex. July 12, 2017).

20.     Defendants' motion does not mention Fed. R. Civ. P. 12(b)(6), referring only to
Fed. R. Civ. P. 9(b), which sets forth the pleading requirements for fraud claims. However, "[a]
dismissal for failure to plead fraud with particularity under Rule 9(b) is treated as a dismissal for
failure to state a claim under Rule 12(b)(6)." *Musket Corp. v. Suncor Energy (U.S.A.) Mktg.*, 759
F. App'x 280, 286-87 (5th Cir. 2019). Rule 9(b) provides that:

> In alleging fraud or mistake, a party must state with particularity the circumstances
> constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a
> person's mind may be alleged generally.

Fed. R. Civ. P. 9(b). This is sometimes characterized as requiring allegations of the "who, what,
when, where, and how" of an alleged fraud.

21.     "What constitutes 'particularity' will necessarily differ with the facts of each case."
*Suarez v. U.S. Bank Tr. Nat'l Ass'n*, No. SA-18-CV-00849-OLG, 2019 U.S. Dist. LEXIS 34374,
at *8 (W.D. Tex. Mar. 4, 2019). "[T]he traditional 'time, place, contents, and identity standard is
not a strait jacket for Rule 9(b).'" *United States v. Paramedics Plus LLC*, Civil Action No. 4:14-

CV-00203, 2017 U.S. Dist. LEXIS 177342, at *8-9 (E.D. Tex. Oct. 25, 2017) (denying motion to dismiss) (citing *U.S. ex rel. Grubbs v. Ravikumar Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009) (reversing dismissal)). Rather, "Rule 9(b) 'is context specific and flexible'" and "a plaintiff may sufficiently 'state with particularity the circumstances constituting fraud or mistake' without including all the details of any single court-articulated standard." *Id.* (citations omitted). RNF's complaint more than adequately satisfies this standard.

**B. RNF properly pled statutory fraud (Count II) and fraudulent inducement (Count V) with the requisite particularity.**

22.     To state a claim for statutory fraud pursuant to Texas Business and Commerce Code § 27.01, RNF was required to allege that, in a transaction involving stock in a corporation or joint stock company, the Individual Defendants made a:

> false promise to do an act, when the false promise is: (A) material; (B) made with the intention of not fulfilling it; (C) made to a person for the purpose of inducing that person to enter into a contract; and (D) relied on by that person in entering into that contract.

Texas Business and Commerce Code § 27.01(a).

23.     The elements of a claim for fraudulent inducement are that "(1) Defendants made a false material misrepresentation; (2) Defendants knew the representation was false when made or made it recklessly without knowledge of its truth; (3) Defendants intended to induce Plaintiffs to act upon the representation; and (4) Plaintiffs actually and justifiably relied upon the representation, and thereby suffered injury." *Simms v. Jones*, 879 F. Supp. 2d 595, 600-01 (N.D. Tex. 2012).

24.     For the most part, Defendants do not contest that RNF has sufficiently pleaded the elements of both of these causes of action. Instead, they make two discrete arguments as to both causes: (i) that the complaint fails to identify the specific representations RNF relied upon; and (ii)

that the complaint fails to attribute specific representations to specific defendants. Neither of these arguments withstand scrutiny.

25.     In support of their first argument, Defendants conveniently ignore the bulk of RNF's allegations, citing just one summary paragraph in Count V, and falsely stating that "[t]he Complaint contains only [a] general summary of the representations on which plaintiff allegedly relied." ECF No. 11, p. 3 (citing Compl. ¶ 80). But in Count II, the statutory fraud count challenged, RNF specifically identifies the false statements at issue, alleging: "In order to induce RNF to enter into the Alamo Company Agreement and provide $1.75 million in exchange for units of ownership in Alamo, the Individual Defendants represented to RNF that RNF would be unconditionally paid a Preferred Return and repaid its Initial Capital Contribution within five years, including as necessary by a Guarantor owned in partnership by the Individual Defendants. Absent this representation, RNF would not have invested $1.75 million …." Compl. ¶¶ 61-62.  This allegation is crystal clear about the specific representations at issue. It alone would be sufficient.

26.     However, the complaint expands upon ¶¶ 61-62 in the preceding allegations, all of which are specifically incorporated by reference in Count II. *Id.* ¶ 57. This includes additional identification of fraudulent statements that RNF's investment would be returned promptly, with interest, and that payment would be guaranteed by BIII, a company with millions of dollars for which the Individual Defendants promised not to divert revenue or business opportunities. *Id.* ¶¶ 17-19. The complaint further alleges that RNF was induced to invest "[r]elying on and convinced by these express and material representations about the timing and terms for repayment, and about the financial performance of BIII." *Id.* ¶ 20.

27.     To remove all doubt, the parties explicitly agreed upon the representations that induced RNF to make its investment by reducing the representations to writing in the Alamo

Company Agreement. They thus agreed that: "*[I]n order to induce the [investment]*," each of the Individual Defendants promised "to cause BIII to provide a guaranty (the 'BIII Guaranty') to RNF with respect to the return of RNF's [investment] not later than the fifth anniversary of the closing." *Id*. ¶ 21 & Compl. Ex. 1 (emphasis added).

28.     The Alamo Company Agreement states that RNF did rely on these statements. This is confirmed elsewhere in the complaint, too, where the statements are further pleaded, *id*. ¶¶ 23-24, and RNF's reliance on them is pleaded, too, *id.* ¶ 25 ("These express written representations and obligations **induced** RNF to fund the transaction.") (emphasis added); *see also id.* ¶ 20 (alleging that RNF made its investment "[r]elying on and convinced by these express and material representations about the timing and terms for repayment, and about the financial performance of BIII …").

29.     These representations were each false. RNF was not repaid its investment as promised and was paid no interest. *Id*. ¶ 35. Moreover, immediately subsequent to closing, and contrary to their representation, the Individual Defendants depleted BIII and rendered it meaningless as a guarantor. *Id*. ¶¶ 26-27; *see also id.* ¶ 63 (summarizing allegations evidencing the Individual Defendants never intended to keep their promises).

30.     When the promise to maintain BIII as an entity capable of funding the guaranty was revealed as false in the first year following closing, the Individual Defendants made additional false statements about FMP to induce RNF to accept FMP as a substitute guarantor. This included statements that "FMP SA is a highly profitable LLC for years to come," that FMP had only minimal additional guaranty obligations and specifically that FMP did not have any guaranty obligations to Arizona Bank & Trust related to Alamo's debt. *Id*. ¶¶ 30, 34. Moreover, through the Assumption Agreement, which incorporated the terms of the BIII Guaranty for FMP, the

Individual Defendants promised to continue to operate FMP as they had before it was guarantor and not to divert revenue from it. *Id*. ¶ 34. Again, these representations were false. *Id*. ¶¶ 32-33 (alleging how, after the Assumption Agreement was signed, the Individual Defendants depleted FMP and caused it to guaranty $23 million of Alamo debt with Arizona Bank & Trust).

31.     In light of all of these specific allegations, Defendants' argument that the complaint "fails to specify which representations are alleged to be false and relied upon by plaintiff" rings hollow. *See* ECF No. 11, p. 4.

32.     Defendants' other challenge to Count II is that it "fails to attribute specific representations to specific defendants," thereby failing "to give each defendant fair notice of the claims alleged against that defendant." *Id*., p. 2. This argument also does not pass a straight-face test.

33.     The complaint in each instance alleges that the representations at issue were either: (i) made by "Kemp, on behalf of himself and the other Individual Defendants," *see, e.g.*, Compl. ¶¶ 16, 17, 18, 19, 26, 30; or (ii) made by all of the Individual Defendants when they signed the Alamo Company Agreement incorporating Kemp's earlier promises and those of the BIII Guaranty, *id*. ¶¶ 21-25 (including the allegation that "Kemp's representations and inducements were expressly incorporated" in the Alamo Company Agreement signed by each of the Individual Defendants and attached as Ex. 1 to the complaint).

34.     Even before each of the Individual Defendants adopted Kemp's false statements when they each signed the Alamo Company Agreement, Kemp's statements as their agent were properly imputed to them. *E.g., TIG Ins. Co. v. James*, 276 F.3d 754, 760 (5th Cir. 2002) ("[An] agent's misrepresentations can create liability for the principal if the agent acts with actual or apparent authority."); *Commonwealth Mortg. Corp. v. First Nationwide Bank*, 873 F.2d 859, 864

Case 5:19-cv-00757-OLG   Document 16   Filed 09/26/19   Page 12 of 20

(5th Cir. 1989) (affirming judgment of liability against principal and observing: "Under Texas law, a principal can be held liable for misrepresentations of an agent speaking within the scope of his authority."); *Energy Maint. Servs. Grp., LLC v. Sandt*, 401 S.W.3d 204, 215 (Tex. App.—Houston [14th Dist.] 2012, pet. denied) (sustaining verdict of statutory fraud where jury could conclude that misrepresentations were made by defendant's agent).

35.    That is exactly what is alleged here, as supported by the complaint's specific allegations that:

> In dealings with the RNF Investors, Defendant Jason Kemp acted as the Individual Defendants' agent and spokesperson. Kemp represented that he had authority to act on behalf of the Individual Defendants, who made business decisions together, shared control of their entities, and shared the profits from their business endeavors.

Compl. ¶ 15. RNF also alleges that Kemp is a member of Defendant FMP. *Id*. ¶ 7.

36.    Moreover, in addition to Kemp speaking as the other Individual Defendants' agent, the complaint further alleges that the Individual Defendants, including Kemp, "hold themselves out as 'partners' in various business ventures and entities, all operating under the umbrella name 'Food Management Partners'" and "jointly owned and operated entities that provided management, administrative, and consulting services to restaurant clients, including restaurants that the Individual Defendants owned." *Id*. ¶¶ 14-15. Partners are, as a matter of law, vicariously liable for each other's frauds in furtherance of their partnership. *See* Tex. Bus. Orgs. Code § 152.304 (stating generally that "all partners are jointly and severally liable for all obligations of the partnership"); *accord King v. Matney,* 259 S.W.2d 606, 608–09 (Tex. Civ. App.—Amarillo 1953, writ ref'd n.r.e.) ("A contract of partnership is, in effect, one of mutual agency, each partner acting as principal on his own behalf and as an agent for his copartner in the transaction of partnership affairs. Each partner is jointly, and generally severally, liable for contractual

obligations assumed and tort liabilities incurred by other partners in the course and within the scope of partnership business.").

37.     While Kemp's statements are thus properly imputed to each Individual Defendant as their agent and partner, and further while each Individual Defendant incorporated Kemp's statements and agreed on what induced RNF to make its investment when each signed the Alamo Company Agreement, each of the Individual Defendants would further be liable for statutory fraud because none of them disclosed the falsity of the representations from which each benefitted. *See id.* ¶ 60 (citing Tex. Bus. & Com. Code § 27.01(d)) ("a person who has actual awareness of a false representation or promise made by another person, fails to disclose the falsity of the representation to the person defrauded, and benefits from the false representation or promise is liable for exemplary damages"); *see also id.* ¶¶ 63-65. *E.g., Autoficio, LLC v. Cimble Corp.*, Civil Action No. 4:17-cv-00404-KPJ, 2018 U.S. Dist. LEXIS 204794, at *11-16 (E.D. Tex. Dec. 4, 2018) (denying motion to dismiss statutory fraud claim against shareholder based on allegations that supported the conclusion the shareholder was aware of misrepresentations and did not correct or disclose them). On this ground, too, RNF has stated a claim for statutory fraud.

38.     RNF's fraudulent inducement claim in Count V is properly pleaded, too, for all of these same reasons. Count V specifically incorporates by reference all of the preceding allegations. *See* Compl. ¶ 79. There is no requirement that RNF cut, paste, and repeat in Count V the preceding specific and detailed allegations. To the contrary, the federal rules explicitly permit such incorporation by reference. *See* Fed. R. Civ. P. 10(c). Neither can any fair reading of the complaint support a claim of ambiguity about the false statements that induced RNF to make its investment. This is particularly so where each of the Individual Defendants signed the Alamo Company Agreement expressly stating that RNF was "*induced*" by the promise of repayment, with interest,

within five years, guaranteed by a financially viable entity from which no revenue would be diverted. Compl. ¶ 21 & Compl. Ex. 1. The Individual Defendants signed this statement, which echoed the prior statements by Kemp on their behalf, never intending to abide by it, as their subsequent, pleaded conduct evidenced. *See id.* ¶ 63; *Wilmot v. Bouknight*, 466 S.W.3d 219, 229 (Tex. App. 2015) (affirming judgment of fraudulent inducement; stating: "Texas courts have long held that when one party enters into a contract with no intention of performing, that misrepresentation may give rise to an action in fraud."). Defendants' arguments concerning Count V thus fail for the same reasons that the same arguments fail concerning Count II.[3]

39.     Ultimately, for both Counts II and V, the detail set forth in the complaint more than satisfies the heightened pleading requirements of Rule 9(b), under which the bottom line remains whether the complaint "provide[s] adequate notice to [defendant] to enable it to understand the allegations and prepare a responsive pleading." *United States ex rel. Woodlee v. Sci. Applications Int'l Corp.*, Civil Action No. SA-02-CA-028 WWJ, 2005 U.S. Dist. LEXIS 49854, at *16 (W.D. Tex. Feb. 3, 2005) (construing pleadings "so as to do substantial justice" and finding that, even under the heightened pleading requirements of Rule 9(b), the complaint there at issue "cannot be fairly characterized as 'conclusory allegations of fraud'"); *LVI Facility Servs. v. Watson Rd. Holding Corp.*, No. A-12-CV-672-LY, 2013 U.S. Dist. LEXIS 142064, at *36-37 (W.D. Tex. Oct. 1, 2013) (recommending denial of motion to dismiss even though the complaint did not "specify

---

[3]     Oddly, one of the primary cases on which Defendants rely concerning the requirement to plead which representations a plaintiff relied upon is a False Claims Act case. *See* ECF No. 11, p. 3 (citing *United States ex rel. Grubbs v. Ravikumar Kanneganti*, 565 F.3d 180 (5th Cir. 2009)). In *Grubbs*, the Fifth Circuit <u>reversed</u> an order of dismissal, stating that "a procedural rule [Rule 9(b)] ought not be read to insist that a plaintiff plead the level of detail required to prevail at trial," that "the 'time, place, contents and identity' standard is not a straitjacket," and that the requirements of Rule 9(b) are context specific and must be applied with commonsense. *See Grubbs*, 565 F.3d at 189-90, 195.

precisely when and where these conversations took place" and taking allegations "in their entirety").

40. Neither is this a case in which RNF has "lumped together dissimilar defendants and asserted that everyone did everything." ECF No. 11, p. 2. RNF's complaint is clear which statements were made by Kemp, as an agent and partner on behalf of the other Individual Defendants, and which statements, *i.e.*, those in the Alamo Company Agreement and the incorporated BIII Guaranty, were made by each and every Individual Defendant when they signed that document. Moreover, the actual documents that form part of the basis for the claims are attached to the complaint and speak for themselves as to the representations made therein. *See* ECF No. 1, Exs. 1 & 2. *See Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000) ("[D]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim.").

41. For all of these reasons, Defendants' motion to dismiss Counts II and V are properly dismissed.

### C. RNF properly pled conspiracy (Count IV) with sufficient particularity.

42. Finally, RNF has sufficiently pleaded a civil conspiracy to defraud it among the Individual Defendants. The Texas Supreme Court recently clarified that the elements of civil conspiracy are: "'(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result.'" *Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, --- S.W.3d ---, 2019 Wl 1495211, at *4 (Tex. April 5, 2019) (citation omitted).

43. Civil conspiracy is a derivative tort and, in this case, it derives from an agreement among the Individual Defendants to commit statutory fraud. *Id.*; Compl. ¶ 75. As other courts have

recognized, the sufficiency of RNF's allegations of statutory fraud, therefore, also supports the allegation of conspiracy to commit statutory fraud. *Airport Blvd. Apts., Ltd. v. NE 40 Partners, Ltd. P'ship, (In re NE 40 Partners, Ltd.)*, 411 B.R. 352, 366 (Bankr. S.D. Tex. 2009) (holding that allegations of underlying fraud claim, which were properly pleaded, were also sufficient to support civil conspiracy cause of action against motion to dismiss).

44.     Defendants' only challenge to the conspiracy claim is their argument that RNF failed to sufficiently allege a meeting of the minds to accomplish an unlawful purpose. ECF No. 11, p. 5. But that is not the case. The complaint alleges:

- "Each of the Individual Defendants, acting as a partnership and holding themselves out as such, agreed with the other to make false representations to RNF resulting in statutory fraud pursuant to Texas Business and Commerce Code § 27.01." Compl. ¶ 75.

- "Specifically, the Individual Defendants agreed to state to RNF that RNF would be unconditionally repaid its investment plus interest within no more than five years of the closing, including by a Guarantor owned and controlled by the Individual Defendants. These representations were false and the Individual Defendants had no intention of fulfilling their promises, as demonstrated by the facts pleaded above and incorporated herein." *Id.* ¶ 76.

45.     Acknowledging these allegations, as they must, the Individual Defendants argue that they are nevertheless insufficient because "[a] prediction of a future event is neither unlawful nor a basis for fraud." ECF No. 11, p. 5. This is an incorrect statement of the law and, tellingly, the Defendants cite no authority to support it. The statutory fraud statute itself provides just the opposite, stating a defendant commits statutory fraud when he or she makes a "false promise *to do an act*, when the false promise is (A) material; (B) made with the intention of not fulfilling it; (C) made to a person for the purpose of inducing that person to enter into a contract; and (D) relied on by that person in entering into that contract." Texas Business and Commerce Code § 27.01(a) (emphasis added).

16

46.     The Individual Defendants also complain that RNF does not identify the specific meeting by place and time when the conspirators had their meeting of the minds to commit statutory fraud. ECF No. 11, p. 5. Without citation to authority, they argue that Rule 9(b) requires this level of specificity, even as to conspiratorial meetings to which, of course, RNF was not privy.

47.     As noted at the outset, however, the Fifth Circuit does not apply Rule 9(b) like a "straitjacket" in this manner. *See Grubbs*, 565 F.3d at 189-90. "Rule 9(b) does not work to penalize a plaintiff merely because he was not privy to, and, therefore, cannot plead the details of, the inner workings of a group of defendants who allegedly acted in concert to defraud him." *Airport Blvd. Apts.*, 411 B.R. at 366. Indeed, on its face, Rule 9(b) provides that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). In other words, "Rule 9(b) creates a relaxed standard for pleading a party's mental state and the Plaintiff need only allege facts sufficient to support a reasonable inference that [Defendants] harbored the requisite mental state for civil conspiracy." *Airport Blvd. Apts.*, 411 B.R. at 367.

48.     Put another way, "an agreement to cause the injury may be inferred 'from joint participation in the transactions and from enjoyment of the fruits of the transactions.'" *Artho v. Happy State Bank (In re Artho)*, 587 B.R. 866, 885 (Bankr. N.D. Tex. 2018); *Janvey v. Adams & Reese, LLP*, Civil Action No. 3:12-CV-0495-N, 2013 U.S. Dist. LEXIS 202981, at *26 (N.D. Tex. Sep. 11, 2013) (denying motion to dismiss civil conspiracy allegation based on failure to allege the specifics of the conspirators' meetings; sufficient surrounding facts alleged "to imply a meeting of the minds"); *Smith v. Spohn (In re IFS Fin. Corp.)*, Nos. 02-39553, 04-03830, 2009 Bankr. LEXIS 4073, at *13 (Bankr. S.D. Tex. Dec. 9, 2009) (denying motion for more definite statement where surrounding facts demonstrated willing participation in scheme from which a meeting of minds could be inferred).

17

49.     RNF has met these standards in this case, pleading facts that support an inference of concerted action by the Individual Defendants to knowingly make false promises to RNF, from which each benefitted, and with no intent to abide by them.

**D.  Conclusion**.

50.     RNF's complaint lays out a series of specific false statements made by Kemp, who was the Individual Defendants' agent and partner. He promised RNF its $1.75 million would promptly be repaid, with interest, guaranteed by a cash-rich entity the Individual Defendants owned and controlled and from which they would not divert revenue. To remove all doubt, each Individual Defendant then signed the Alamo Company Agreement, incorporating the BIII Guaranty, and ratifying and repeating that these representations had been made "in order to induce" RNF's investment.

51.     The complaint's well-pleaded facts demonstrate that the Individual Defendants never intended to keep these promises and had so agreed. There can be no serious question that RNF's allegations, combined with the parties' agreements attached to and incorporated in the complaint, clearly and specifically make out a plausible case of statutory fraud, fraudulent inducement, and civil conspiracy to commit statutory fraud. The Defendants' cursory motion fails to take on the gravamen of RNF's allegations or the governing law.

## **PRAYER**

52.     For the foregoing reasons, Plaintiff respectfully requests that the Defendants' Motion to Dismiss be denied. Plaintiff further requests any other relief to which it may be entitled, at law or in equity.

DATED:  September 26, 2019

Respectfully submitted,

**A&G Law, LLC**

By:     */s/ Robert M. Andalman*
          Robert Andalman
          Illinois State Bar No. 6209454
          *Admitted pro hac vice*
          E-mail: *randalman@aandglaw.com*
          Rachael Blackburn
          Illinois Bar No. 6277142
          *Admitted pro hac vice*
          E-Mail*: rblackburn@aandglaw.com*
          Alexis Hawker
          Illinois State Bar. No. 6272375
          *Admitted pro hac vice*
          E-Mail: *ahawker@aandglaw.com*
          542 South Dearborn St., 10th Floor
          Chicago, Illinois 60605
          Phone: 312.348.7629
          ***Attorneys for Plaintiff River North Furr's LLC***

          **DAVIS & SANTOS, P.C.**

          Jason M. Davis
          State Bar No. 00793592
          E-mail:  *jdavis@dslawpc.com*
          Caroline Newman Small
          State Bar No. 24056037
          Email:  *csmall@dslawpc.com*
          719 S. Flores Street
          San Antonio, Texas 78204
          Tel:  (210) 853-5882
          Fax: (210) 200-8395
          ***Attorneys for Plaintiff River North Furr's LLC***

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on September 26, 2019, I caused the foregoing ***PLAINTIFF'S***

***RESPONSE TO DEFENDANTS' MOTION TO DISMISS*** to be electronically filed using the

CM/ECF system which will send notification of such filing to all parties of record via the court's

CM/ECF system.

*/s/ Robert M. Andalman*
Robert M. Andalman
